**SO ORDERED.**

**SIGNED this 29 day of March, 2016.**



**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### NEW BERN DIVISION

**IN RE:**

**MIDSOUTH GOLF, LLC**              **CASE NO. 13-07906-8-SWH**

    **DEBTOR**                              **CHAPTER 11**

## ORDER RESOLVING THRESHOLD ISSUES AND
## DETERMINING THAT SALE OF REAL PROPERTY FREE OF COVENANT
## MAY BE PART OF CONFIRMED PLAN

A hearing related to confirmation of the debtor's Amended Plan was held in Raleigh, North Carolina on June 23, 2015, at which time the court took under advisement certain issues that it deemed prudent to resolve as threshold matters before proceeding further with confirmation.[1]  On September 25, 2015, the court requested that the parties file briefs addressing those issues and, specifically, the question that has proved to be dispositive with respect to whether the debtor can confirm its amended plan:  Whether a covenant (the "maintenance covenant") imposing on the debtor an affirmative obligation to maintain and operate the recreational amenities on its property is a real covenant that "runs with the land" and, if so, whether that means (as argued by creditor

---

[1] By order entered on August 13, 2015, the court granted debtor MidSouth's motion to hold in abeyance the adversary proceeding filed by plaintiff Fairfield Harbor Property Owners' Association, Inc. ("Fairfield"), pending the court's decisions on the threshold matters and on confirmation of the debtor's amended chapter 11 plan.

Fairfield Harbor Property Owners Association, Inc. ("Fairfield")) that under no theory can the maintenance covenant be stripped from the property in connection with a sale of it within the debtor's amended Chapter 11 plan.[2]  Both the debtor and Fairfield filed comprehensive responses, which the court has thoroughly reviewed.

---

[2] The order of September 25, 2015 provided that for purposes of the requested memoranda, "the parties should assume that the *only* covenant(s) at issue, and the only covenant(s) that MidSouth seeks to negate, are those that impose on MidSouth and/or could impose on a subsequent buyer an affirmative obligation to maintain and operate the recreational amenities on the debtor's property (the "maintenance covenant")." The order then lists the issues to be briefed, as follows:

1.     Identify with precision, including pinpoint citation, portions of each prior North Carolina state court appellate ruling involving these parties wherein the appellate court specifically identifies the maintenance covenant and holds that covenant to be 1) either an "affirmative" restrictive covenant, or a "negative" restrictive covenant; 2) either a "personal" covenant, or a "real" covenant; and/or to 3) run with the land.

2.     Address the significance of the North Carolina Court of Appeals' opinion in *Properties of Southern Wake, LLC v. Fidelity Bank*, 224 N.C. App. 398, 2012 WL 6590844 (N.C. App. 2012) (unpublished disposition) (construing *MidSouth Golf*, 652 S.E.2d 378 (N.C. 2007).

3.     Address the extent to which the existence and/or outcome of litigation (including, in this case, the series of the decisions by the North Carolina Court of Appeals) may effect and/or constitute a material change in circumstances, including the extent to which application of the change in circumstances test is temporal in nature and the significance of any temporal aspect in applying the *Rooker-Feldman* doctrine.  *See The Melrose Club, Inc. v. Onorato (In re Daufuskie Island Properties, LLC)*, 431 B.R. 657 (Bankr. D.S.C. 2010).

4.     State whether, if the court ultimately approves the sale of the property free and clear of the maintenance covenant, that determination must be made in the adversary proceeding and, if so, on what basis.

5.     Address the relationship between the three decisions of the North Carolina Court of Appeals, specifically the extent of their consistency/inconsistency and the effect of any inconsistency on the application of the Rooker-Feldman doctrine by this court.

Order Regarding Disposition of Threshold Issues at 2 (Sept. 25, 2015) (DE 305).

After full consideration and for the reasons set forth below, the court concludes that the state courts' decisions include no findings of fact or law regarding the nature, extent, enforceability, or any other material aspect of the maintenance covenant. For that reason, they are not binding on this court's analysis of the maintenance covenant, although they do inform it. The appellate court's opinions set out extensive factual and legal determinations with respect to Fairfield, MidSouth, and the underlying state court litigation, all of which are integrated into the established "fact set" that MidSouth brings with it into the bankruptcy court. For the reasons set out below, this court concludes that the maintenance covenant does not run with the land; in addition, as a separate and alternative holding, the court finds that even if it did, the property still could and should be sold free and clear of that covenant. Further, resolution of this issue does not require an adversary proceeding.

## JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334 to enter final judgment. The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984, by the United States District Court for the Eastern District of North Carolina.

## BACKGROUND AND PROCEDURAL POSTURE

Debtor MidSouth filed its petition under chapter 11 of the Bankruptcy Code on December 20, 2013, after more than a decade of litigation in North Carolina state courts relating to amenities and recreational facilities on real property owned by the debtor within a golf course community in New Bern, North Carolina. Purchased by the debtor in 2000, the 385-acre property ("the Property") features amenities including two golf courses, two marinas, tennis courts, swimming pools, and

clubhouses, all of which are part of a large community development that also includes some 3,000 homes, timeshare condominiums, and vacant lots.  The community was developed pursuant to written declarations and covenants that were first recorded in 1971, then amended and/or expanded in 1975, 1979, and 1993.  Generally speaking, the covenants at the root of the dispute stipulate that the development's residential property owners will pay amenity fees to the owner of the Property (currently, MidSouth)  – this is the "amenities covenant" – and, separately, that the owner of the Property will maintain those recreational amenities for use by the residential property owners, along with others; *i.e.*, the  "maintenance covenant."

The current dispute originally was sparked by MidSouth's decision to seek changes to the amenity fee payment arrangement applicable to the timeshare owners a few years after it purchased the Property.[3]  MidSouth's effort to increase fees led to litigation and, ultimately, to the first of three decisions from the North Carolina Court of Appeals pertaining to the amenities covenant and the nature of the contractual obligations as between MidSouth and other parties.  The first decision, handed down in 2007, held that the amenity covenant was a personal rather than real covenant, and thus was not enforceable as against the timeshare owners.  *MidSouth Golf, LLC v. Fairfield Harbourside Condo Ass'n, Inc.*, 187 N.C. App. 22, 652 S.E.2d 378 (2007) (the "Timeshare Opinion").  Additional decisions in 2011 affirmed trial court decisions in two separate lawsuits.  In the first, the court of appeals agreed that MidSouth breached its covenant to maintain the golf

---

[3] Specifically, MidSouth sought to enforce an aspect of the 1993 Covenants that permitted the Property owner to collect amenity fees from the timeshare owners at a rate up to 5.556 times higher than the fees collected from individual lot owners. MidSouth's predecessor, HRC, sought to enforce this provision, which prompted a dispute with the timeshare owners that ultimately was resolved in a 1998 settlement agreement between the timeshare owners and HRC. MidSouth purchased the Property from HCR in 1999; the purchase agreement references the Master Declaration and the 1993 Covenants, but not the 1998 settlement agreement.

courses when it closed them due to nonpayment of amenity fees, and that Fairfield could enforce the maintenance covenant against MidSouth. *Fairfield Harbour Property Owners Ass'n, Inc. v. MidSouth Golf, LLC*, 215 N.C. App. 66, 715 S.E.2d 273 (2011) (the "Enforcement Opinion"). In the second, a separate panel of the appellate court affirmed the trial court's conclusion that MidSouth could not enforce the amenities covenant by requiring payment from the individual homeowners under the 1975 and 1979 declarations. *Waterford v. MidSouth Golf, LLC*, 215 N.C. App. 394, 716 S.E.2d 87 (2011) (unpublished disposition) (the "Homeowners Opinion"). The upshot of all this litigation, in grossly oversimplified terms, is that the amenity covenant is "out" such that the property owners represented by Fairfield are no longer paying the fees necessary to fund MidSouth's maintenance of the golf courses and recreational facilities; however, the maintenance covenant remains "in," requiring MidSouth to continue to provide those services based on its ownership of the Property and without compensation. Fairfield argues that the maintenance covenant is a real rather than personal covenant, such that whomever owns the Property – be it MidSouth or some other entity – likewise would be required to maintain and operate the golf courses and other amenities, without payment as contemplated by the amenities covenant. The threshold question now before the court is whether that maintenance covenant may be stripped from the Property in order to sell the Property in MidSouth's chapter 11 plan, free and clear of the maintenance obligation.

## DISCUSSION

### I.    Effect of State Court Decisions

The parties are sharply divided about the extent to which state court litigation, and in particular the three decisions issued by the North Carolina Court of Appeals, are material to this

bankruptcy case. Fairfield argues that the state courts specifically held that the maintenance covenant runs with the land; MidSouth contends that they held no such thing. Applicable here is the *Rooker-Feldman* doctrine, which embodies the "rule that a federal court cannot consider claims actually decided by a state court or claims inextricably intertwined with an earlier state court judgment" and prevents "state court losers" from seeking second bites from the decisional apple in federal court. *In re Kimmell*, 527 B.R. 215, 219 (Bankr. E.D.N.C. 2015). As Fairfield emphasizes, to be "inextricably intertwined," the "granting of the relief sought by the plaintiff in the federal complaint must necessarily determine that the state court judgment was 'erroneously entered or must take action *that would render the judgment ineffectual*." *In re Hinson*, 481 B.R. 364, 374 (Bankr. E.D.N.C. 2012) (emphasis by Fairfield), *quoted in* Fairfield Mem. of Law Regarding Disposition of Threshold Issues at 14.

This court undertook a painstaking review of all three decisions, which devolved into a lengthy struggle to isolate precisely what these decisions *do* hold, what they *don't* hold, and to which parties each opinion pertains. That analysis led the court to the preliminary conclusion that the state courts had *not* ruled on the specific issue at hand, notwithstanding the fact that Fairfield (and originally, to a lesser extent, even the debtor) was certain that they had. In the interest of clarifying the extent of those holdings before proceeding further, the court requested the parties' submission of focused discussions and pinpoint citation in support of their interpretation of the Court of Appeals' opinions.

## A.    Parties' Arguments

According to Fairfield, the state courts necessarily found that the maintenance covenant is a real as opposed to personal covenant, and that conclusion (and therefore also the covenant) is inviolable in this court under the *Rooker-Feldman* doctrine.  Fairfield maintains:

> The North Carolina State Courts have specifically held that the 1993 covenants (Section Three, "Access and Use Restrictions and Affirmative Obligations") are not personal, required MidSouth ... as the owner of the property subject to those covenants, to "maintain and operate" the recreational amenities located thereon and that those covenants were enforceable by Fairfield. *Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 215 N.C. App. 66, 79, 715 S.E.2d 273, 284 (2011).  The issue regarding whether the 1993 Covenants were "personal" was actually litigated and decided against Midsouth, with summary judgment being granted affirmed [sic] on Midsouth'[s] contention (Eighth Defense) that the covenants were "Personal Covenants," as well as Midsouth's request to the court to "declare that the burdens imposed upon the owner of the amenities in Fairfield Harbour by the 1993 Covenants are personal covenants which are unenforceable against MidSouth." [citation to record omitted.] The trial court granted summary judgment against Midsouth on its Eighth Defense ("Personal Covenants"). [citation to record omitted.]  On appeal, Midsouth assigned error to "the Trial Court's entry of Summary Judgment in favor of Plaintiff as to Midsouth's Eighth Defense regarding personal covenants." [citation to record omitted.][4]

---

[4] Here, Fairfield is referring to the litigation culminating in the Enforcement Opinion.  In defense to the action brought against it by Fairfield, MidSouth had stated in its Eighth Defense that because MidSouth's right to collect amenity fees from the timeshare owners had been declared unenforceable, the scheme of development originally contemplated by the series of declarations and covenants had been defeated, and the burdens imposed upon MidSouth were no longer tied to reciprocal benefits arising from ownership of the Property. On that basis, MidSouth asked the trial court to declare that "the burdens imposed upon the owner of amenities in Fairfield Harbour by the 1993 Covenants are personal covenants which are unenforceable against MidSouth."  *See Fairfield Threshold Mem.* at 2 (quoting and providing citation to record on appeal).

Without discussion, in a two-page order, the trial court granted Fairfield's motion for summary judgment on the issue of MidSouth's breach of restrictive covenants, denied MidSouth's motion for summary judgment, and dismissed MidSouth's counterclaim and Sixth through Fourteenth defenses.  In so doing, the Hon. John E. Nobles Jr., Judge Presiding, wrote:

> So that this Court's ruling on Defendant's Counterclaim and Sixth through Fourteenth defenses will not affect any other pending litigation in which

7

The Court of Appeals held, in affirming the grant of summary judgment, that the covenants were enforceable by Fairfield.  In so doing, the Court of Appeals rejected Midsouth's argument that the covenants were "personal", enforceable only by the parties to the 1993 Covenants.  If the covenants are not personal, they are real. [citations omitted.] If the covenants were not "personal" as argued by the Debtor, they were/are "real," which by law means they "run with the land." [citations omitted.] Had the North Carolina Court of Appeals determined that the covenants were personal, they could not have determined that the 1993 Covenants were enforceable by Fairfield.  Thus, the issues of whether the 1993 Covenants are real versus personal are "inextricably intertwined", and under the *Rooker-Feldman* doctrine, cannot be relitigated in this Court.... [E]ach of the other rejected defenses of the Debtor, including radical change in circumstances, are defenses only raised to enforcement of real covenants.

*Fairfield Threshold Mem.* at 1-3.

In response, MidSouth maintains that none of the decisions issued by the court of appeals address the issues of whether the maintenance covenant "is an affirmative or negative covenant, is real or personal, or runs with the land." *Debtor's Supplemental Mem. ("MidSouth Supp. Mem.")* at 1.  MidSouth goes on to more fully flesh out this argument, but the court of appeals' decisions speak for themselves. The court turns now to those.

**B.    Summary of Court of Appeals' Decisions**

   **1.  2007 Timeshare Opinion**

———————————————

Defendant is a party, the Court's ruling on Defendant's Counterclaim and Sixth through Fourteenth defenses is limited to this proceeding only, and such ruling shall not be relied upon by other Courts or used for any purpose.  Furthermore, this Court's ruling on Defendant's Counterclaim *and Sixth through Fourteenth Defenses shall not be referred to in any other litigation involving the Defendant nor shall it be dispositive of similar or identical issue raised in any other litigation involving the Defendant*.

*Order*, Case No. 08 CVS 703 (Craven Co. Superior Court, NC) (June 27, 2009), at 2 (emphasis added).  This express admonition from the trial court notwithstanding, Fairfield represents that the dismissal of the Eighth Defense by the trial court establishes that the issue was fully litigated and resolved against MidSouth.

8

In the first opinion, the North Carolina Court of Appeals considered whether plaintiff MidSouth could enforce the amenities covenant against various timeshare ownership entities. *MidSouth Golf, LLC v. Fairfield Harbourside Condo Ass'n, Inc.*, 652 S.E.2d 378 (N.C. App. 2007) ("Timeshare Opinion").  The gravamen of the issue before it proved to be one of the timeshare owners' defenses, which the court quoted in full:

> The Master Declaration establishes a license arrangement between the owner of the amenities and the property owners subject to an amenity fee as to the use of any facilities.  As such, and because said amenity fee is not tied to any reciprocal benefits and burdens arising from the ownership of property in Fairfield Harbour, said obligation is a personal covenant and not binding on Defendants or their members.

*Id.* at 381.  That court construed *only* the 1979 Master Declaration and the covenants set out therein; it did not analyze the 1993 Covenants that are contested in the instant matter, which all parties to the Timeshare Opinion agreed were outside the chains of title for the defendant timeshare entities. *Id.*  The court reviewed the Master Declaration's provisions pertaining to use of the amenities, easements for various components of the property, ownership of the amenities, and the purpose to which annual amenity fees would be put, among other things.  *Id.*

At the outset of its discussion, the court rejected MidSouth's argument that *all* property owners in Fairfield Harbour were necessary parties to its action to enforce the amenity covenant. The covenant was for payment of amenity fees as opposed to a residential use restriction, the court reasoned, so "invalidation of the covenant in the present case could have some effect on nonparty property owners in Fairfield Harbor, [but] ... would not deprive them of any property right, which is required under *Karner* to make them necessary parties." *Id.* at 383-84 (citing *Karner v. Row White Flowers, Inc.*, 527 S.E.2d 40 (N.C. 2000) (holding that the right of each property owner within a

subdivision to enforce a residential restriction against another property owner in violation of that

covenant is a valuable property right)).  Here, the court held,

> pursuant to the Master Declaration, only the owner of the recreational amenities has the power to levy such a recreational amenity charge.  As such, only the owner of the recreational amenities has the power to enforce this restrictive covenant.  None of the property owners within Fairfield Harbor have the right to enforce the covenant to pay amenity fees against any other owner.

*Id.*

The court concluded that only MidSouth had the authority to assess fees, which it equated

to a unique ability on the part of MidSouth to enforce the amenities covenant.  Building on that, it

held that only MidSouth – and not the defendants, the Property Owners Association [Fairfield], or

other homeowners in the community – could enforce the amenities covenant and, for that reason,

the other property owners were not necessary parties.[5]  As hindsight makes painfully clear, the

court's determination of the extent to which the amenities covenant could be enforced against the

timeshare owners did indeed have "some effect" on the nonparty property owners and, ultimately,

MidSouth.

Moving to the specific question of law before it – whether the trial court "erred by

concluding that the covenant to pay amenity fees was a personal covenant that did not run with the

land" – the court outlined the basic principles applicable to restrictive covenants, all of which are

---

[5] After thorough review, the factual and legal basis for this holding remains unclear.  The 1979 Master Declaration provides that FHI (*i.e.* the Property owner, and MidSouth), the Fairfield Harbour Property Owners Association, Inc. (*i.e.* Fairfield), and "*any owner of property or any party to whose benefit these restrictions inure may proceed at law or in equity to prevent the occurrence, continuation or violation of any provision hereof.*"  1979 Master Declaration, Art. IX at 18 (emphasis added). The court of appeals necessarily was aware of this language, but presumably found it inapplicable, for reasons it did not articulate.

equally applicable in the instant case. Under North Carolina law, a covenant is either real or personal, with those that run with the land being "real" as distinguished from "personal" covenants, which do not. *Id.* at 384. The three essential elements for creation of a real covenant that runs with the land are: "(1) the intent of the parties as can be determined from the instruments of record; (2) the covenant must be so closely connected with the real property that it touches and concerns the land; and, (3) there must be privity of estate between the parties to the covenant." *Id.* at 384, quoting *Raintree Corp. v. Rowe*, 248 S.E.2d 904, 908 (N.C. App. 1978)).

> With respect to the first requirement, the court noted that
>
> [i]n the present case, the Master Declaration states that all restrictions "shall be deemed to be restrictions running with the land and binding on Purchasers, their heirs, successors and assign[s]." The Master Declaration also specifically declares that "[t]he power to levy [a recreational amenities charge] shall inure also to the successors and assigns of each such recreational amenity[.]" Moreover, the Master Declaration provides that the provisions set forth therein "shall, as to the owner of each such property [within Fairfield Harbour], his heirs, successors or assigns, operate as covenants running with the land for the benefit of each and all other properties in Fairfield Harbour and their respective owners."

*Id.* at 385. In light of those declarations, the court held, "the parties intended that the covenant to pay amenity fees would run with the land." *Id.* at 385.

Next, the court discussed the "touch and concern" requirement, which proved to be the basis for its decision. The touch and concern element "'is not capable of being reduced to an absolute test or precise definition.'" *Id.*, quoting *Runyon v. Paley*, 416 S.E.2d 177, 183 (N.C. 1992). Affirmative covenants requiring a positive act (as compared to negative covenants, which prohibit something) did not run with the land at common law, the court explained, and for that reason, "the requirements for a covenant to run are more strictly applied to affirmative covenants than negative covenants."

11

*Id.*, quoting *Raintree*, 248 S.E.2d at 908.  Put a slightly different way, the court was required to "strictly construe the requirements for creation of a real covenant."  *Id.*

The court's analysis relied heavily on *Raintree*, a 1978 North Carolina Court of Appeals case in which an affirmative covenant to pay money for services and use of country club facilities that were "not upon, connected with, or attached to the defendants' land in any way" was deemed personal, and also on *Neponsit*, a 1938 case cited by the *Raintree* court.  *Id.* at 384-86.  In *Neponsit*, the Court of Appeals of New York determined that a covenant requiring payment of monies for maintenance of roads, parks, and other public purposes *was* a real covenant.  *Id.* at 386-87, construing *Neponsit Property Owners' Ass'n v. Emigrant I. Sav. Bank*, 15 N.E.2d 793, 797 (N.Y. 1938).  The *Timeshare* court emphasized that in *Neponsit*, "the grantees of the plaintiffs' predecessor in title 'obtained not only title to particular lots, but an *easement or right of common enjoyment* with other property owners in roads, beaches, public parks or spaces and improvements in the same tract.'"  *Id.* at 386, quoting *Neponsit*, 15 N.E.2d at 797 (emphasis by the *Timeshare* court).  More specifically, as the *Neponsit* court explained:

> For full enjoyment in common by the defendant and other property owners of these easements or rights, the roads and public places must be maintained.  *In order that the burden of maintaining public improvements should rest upon the land benefitted by the improvements, the grantor exacted from the grantee of the land with its appurtenant easement or right of enjoyment a covenant that the burden of paying the cost should be inseparably attached to the land which enjoys the benefit.*  It is plain that any distinction or definition which would exclude such a covenant from the classification of covenants which 'touch' or 'concern' the land would be based on form and not on substance.

*Neponsit*, 15 N.E.2d at 797, quoted in *Timeshare Opinion*, 652 S.E.2d at 386 (emphasis added).

Applying that analysis to the facts before it, the *Timeshare* court held that "in the present case, the covenant to pay amenity fees did not touch and concern Defendants' properties." *Timeshare Opinion*, 652 S.E.2d at 387.  The court explained that

> [i]n contrast, by virtue of the unique set of covenants in the present case, Defendants *do not have any easement rights in the recreational amenities financed by the recreational amenity charge*; they only have easement rights in the common areas, or parks, within Fairfield Harbour.  The Master Declaration provides that "the use and enjoyment [of the recreational facilities] shall be on such terms and conditions as FHI, its successors, grantees or assigns, from time to time shall license[.]"  Therefore, Defendants merely have a revocable license to use the recreational amenities.  We find this to be a key distinction[.]

*Id.* (emphasis added).  This lack of a specifically denominated *easement* on behalf of homeowners, as opposed to an easement *or right of common enjoyment* as cited in *Neponsit,* proved to be dispositive for the *Timeshare* court.  Accepting the timeshare owners' argument that they had merely a "license arrangement . . . as to use of the facilities," the court distinguished the facts before it from those in *Four Seasons Homeowners Assoc. v. Sellers.*  In that case, the court of appeals held that a covenant requiring payment of maintenance assessments for recreational amenities *did* run with the land where the covenant applied to all lots in an entire subdivision, the recreational facilities were for the use of all who lived there, and – significantly – the covenants provided that every owner had a "nonexclusive right and easement of enjoyment in the common areas," those easements being "appurtenant to each lot."  *Id.* at 387-88, construing *Four Seasons Homeowners Assoc. v. Sellers*, 302 S.E.2d 848, 852 (N.C. App.), *cert. denied*, 307 S.E.2d 364 (N.C. 1983).  Contrasting the facts before it with those in *Four Seasons*, the *Timeshare* court wrote that here, the homeowners did "not have easement rights in the recreational amenities," which led it to conclude that "the recreational amenities are not appurtenant to Defendants' properties, and therefore, the covenant to pay amenities does not touch and concern Defendants' properties."  *Id.* at 388.

13

Next, the *Timeshare* court considered and rejected the argument that "a covenant for *maintenance* of recreational amenities touches and concerns land within a subdivision if the value of the lots within the subdivision are affected by the maintenance of the recreational amenities." *Id.* (emphasis added). The argument was advanced by MidSouth, which originally maintained that *both* the amenities covenant *and* the maintenance covenant were real covenants that ran with the land.[6] MidSouth urged the court to follow *Runyon*, wherein the North Carolina Supreme Court held that "for a covenant to touch and concern the land, '[i]t is sufficient that the covenant have some economic impact on the parties' ownership rights by, for example, enhancing the value of the dominant estate and decreasing the value of the servient estate.'" *Id.*, quoting *Runyon*, 416 S.E.2d at 183. But the *Timeshare* court disagreed, finding that the *Runyon* case didn't "analogize well" because it involved a *negative* covenant and also "two parties with property in close proximity to each other," in contrast to an affirmative covenant common to an entire subdivision. *Id.* The "negative nature of the covenant in *Runyon* was 'strong evidence' that the covenant ran with the land," the court wrote; In contrast, "the affirmative nature of the covenant in the present case is *strong evidence that the covenant did not run with the land*." *Id.* Because it determined that the amenities covenant did not touch and concern the timeshare owners' properties and was for that reason a "personal" covenant that did not run with the land, the court did not reach the third factor – privity of estate. *Id.* at 389. Nor did the court consider an argument MidSouth made on appeal, but not before the trial court; that if the amenity covenant was not enforceable by MidSouth as FHI's

---

[6] After the Timeshare Opinion, MidSouth revised its position, arguing that if the amenities covenant did not run with the land, then the maintenance covenant didn't run with the land either.

successor in interest, then, "the 1993 covenants which are premised on the validity of the amenity fee provision should be declared unenforceable." *Id.*

In sum, in the *Timeshare Opinion*, the court of appeals determined that the amenities covenant was not enforceable by MidSouth against the timeshare owners given that under the 1979 Master Declaration, Midsouth was not in contractual privity with those owners; for that reason, MidSouth could not enforce the amenities covenant as against the owners *unless* it ran with the land, which, the appellate court found, it did not. In addition, the court of appeals determined that the recreational amenities were neither in close physical proximity to nor appurtenant to the timeshare owners' properties, and concluded further that under the 1979 Declaration, the Fairfield Harbour property owners had at most a revocable "license" to use recreational amenities.

### 2. 2011 Enforcement Opinion

In the wake of the *Timeshare Opinion*, many residents of Fairfield Harbour stopped paying the amenity fees, and MidSouth closed the two golf courses due to a lack of funds. This in turn prompted a state court breach of contract action against MidSouth by the Fairfield Harbour Property Owners Association, wherein Fairfield successfully argued to the trial court that MidSouth's closure of the Shoreline Golf Course "was a breach of the Declaration of Covenants requiring [MidSouth] to operate and maintain the golf course and its amenities." *Fairfield Harbour Property Owners Ass'n, Inc. v. MidSouth*, 715 S.E.2d 273, 278 (N.C. App. 2011) ("Enforcement Opinion"). The court allowed Fairfield's motion for partial summary judgment on the breach of contract issue, and dismissed MidSouth's counterclaims and all but one of its defenses. The only issues left for trial were the amount of damages and the frustration of purpose defense. After trial, the court awarded damages of $1,450,000.00 and granted Fairfield's motion for directed verdict on the frustration of

purpose defense. *Id.* at 278. Notable distinctions between this opinion and the earlier Timeshare Opinion are, first, the identity of the parties: The litigation underlying the Enforcement Opinion involves only MidSouth and Fairfield, as opposed to any actual homeowners. And, the Enforcement Opinion pertains to a different contractual agreement – the 1993 Covenants referenced in MidSouth's purchase agreement, not the 1979 Master Declarations at issue in the Timeshare Opinion.

The *Enforcement* court rejected MidSouth's challenge to Fairfield's standing to bring suit, noting that the 1993 Covenants expressly provide that the "Association" (*i.e.* Fairfield) "'shall have the right to enforce, by any proceeding at law or in equity, all of the restrictions, conditions, covenants, easements, reservation[s], liens and charges now or hereafter imposed by the provisions of this Declaration.'" *Id.* at 280. The court then turned to MidSouth's challenge to the trial court's entry of summary judgment. Addressing MidSouth's "radical change in circumstances" argument, the court concluded that MidSouth had offered "no evidence of changes *to the community* that would destroy the purpose of maintaining a golf course in the covenanted community. The *community remains a residential neighborhood* and covenants creating golf courses and amenities for the benefit of those residents are not destroyed." *Id.* at 281-82 (emphasis added). The "radical change" analysis typically involves "physical changes in the covenanted area," the court explained, and MidSouth's "financial hardship" did not qualify as a radical change. *Id.*

The court also disagreed with MidSouth's argument that a failure of consideration made "the covenants"[7] unenforceable. *Id.* at 282. "Restrictive covenants are considered contractual in nature

---

[7] It often is difficult to discern the precise covenant(s) to which the court of appeals is referring because the court, in all three opinions, frequently refers to "the covenants" in a general sense. The parties occasionally do the same. In particular, Fairview frequently asserts that "the

and acceptance of a valid deed incorporating the covenants implies the existence of a valid contract," the court wrote. *Id.* (internal quotations and citation omitted).  The effects of the Timeshare Opinion notwithstanding, the *Enforcement* court held, "*[t]here is nothing here to suggest that Defendant's right to collect the amenity fees was unenforceable*. . . . Though there is evidence that many of the assessed property owners are no longer paying the amenity fees and are boycotting the golf courses, the initial contractual agreement remains valid." *Id.*

Moving on to MidSouth's argument that the trial court erred in awarding summary judgment to Fairfield on grounds that MidSouth's obligations under the maintenance covenant were no longer tied to reciprocal benefits, the court wrote:

> In its brief Defendant asserts that the restrictive covenants impose[] reciprocal benefits and burdens upon Plaintiff and Defendant.  Because Defendant was no longer receiving the amount necessary in fees to maintain the golf courses, it was no longer required to operate the golf courses. However, language in the restrictive covenants specifically provides that the restrictions contained within the covenant are severable.  Merely because one restriction in the covenant was declared *illegal*, the enforceability of the other provisions is not affected.  Because language in the 1993 restrictive covenants *clearly indicates* that the restrictive covenants were not intended to afford reciprocal benefits upon the parties, Defendant's argument is without merit.[8]

---

1993 Covenants are real covenants," as though every covenant within the document is a real covenant, or the whole document qualifies as one giant real covenant. While it's possible that this court might neglect to correct a few overly general references of its own, the court is acutely aware that each individual covenant, within each of the separate declarations of covenants, stands on its own.

[8] The Timeshare Opinion did not find that the amenities covenant was "illegal." This court has no insight into or explanation for the use of this odd, wholly inapplicable reference in the Enforcement Opinion. See *id.* at 282, 284 (again citing "illegal" provision).  Further, the court notes that this finding by the court of appeals necessarily had the effect of stripping the homeowners to which it applied of certain preferences they had heretofore enjoyed, such as preferred tee times, rates, etc., because those preferences inured only to "Assessed Users" who are defined by the 1993 Covenants as any "individual or entity that owners a lot, timeshare, townhouse or condominium at the Project who pays Amenity Fees."  1993 Covenants at 2.

17

*Id.* at 282-83 (emphasis added).

The severability clause is nonremarkable.[9] Under traditional principles of contract construction, severability provisions operate to allow excision of a contractual term or provision found to be unenforceable in some respect, while leaving the remainder of the agreement intact. The *Enforcement* court did not cite (and this court has been unable to locate) its authority for the proposition that inclusion of a severability clause in a contract is, simply by virtue of its presence, indicative of the parties' intent as to fundamental components of the contract. And, the court's discussion on this point is especially confusing given that it comes on the heels of the court's recognition that it is "well established that the intention of the parties governs this Court's review of restrictive covenants," and that the "parties' intent shall be determined from a thorough examination of *all the covenants contained in the instrument or instruments creating the restrictions.*" *Id.* at 280 (emphasis added).

Next, the court rejected the argument that Fairfield was acting in bad faith, making the observation that

> [w]hile a number of assessed lot owners have refused to pay the required amenity fees and are boycotting the golf courses, there is no evidence that these lot owners are acting on Plaintiff's behalf or pursuant to its direction. Plaintiff is an incorporated entity governed by a board of directors. Defendant failed to present any evidence that the decision of individual lot owners to withhold amenity fees was at Plaintiff's direction. While individual assessed property owners may have breached the terms of the restrictive covenants, these actions are not attributable to Plaintiff.

*Id.* at 283.

---

[9] That clause provides: "4.3. <u>Severability</u>. In the event any one or more of the covenants, restrictions, terms, phrases or clauses of this Declaration shall be declared invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provision hereof shall not in any way be affected or impaired thereby." 1993 Covenants at 12.

Finally, the court affirmed the trial court's grant of Fairfield's motion for a directed verdict on the frustration of purpose issue. Again the court cited the severability clause, reasoning that it constituted an "allocation of risk" such that the burden of dealing with the "frustrating event" of nonpayment remained with MidSouth. *Id.* at 284. Specifically, the court wrote, the 1989 Master Declarations stated that if a provision was found to be invalid, unenforceable, or to lack the quality of running with the land, such finding would be "without effect upon the validity, enforceability, or running with the land quality of any other one of the provisions." That severability clause is preceded by a provision entitled "Mutuality of benefits and obligations," which is at odds with the court's interpretation, but that provision was not addressed. Last, the appellate court rejected MidSouth's challenge to the trial court's denial of various of its other motions and its requested jury instructions, none of which are germane to the discussion at hand.

As discussed above, Fairfield reads the Enforcement Opinion as an adjudication of whether *the maintenance covenant* is a real or personal covenant, and ultimately as a judicial determination that it is a real covenant that runs with the land. To the contrary, the Enforcement Opinion *does not address the nature of the maintenance covenant at all*, much less undertake the "strict" inquiry that would be essential to such a determination as outlined in the Timeshare Opinion. Evidently, the court saw no need to do so: MidSouth purchased the Property subject to the 1993 Covenants, among many other obligations. Those covenants specifically identify the property owners' association – *i.e.*, Fairfield – as an entity authorized to enforce the provisions therein against the Property owner – *i.e.*, MidSouth. As between those parties and in that context, the inquiry is a basic matter of contract law. Whether the maintenance covenant was "real" or "personal" was both immaterial to and wholly outside the scope of the *Enforcement* court's analyses.

19

### 3.    2011 Homeowners' Opinion

The third and final installment of the appellate court's reviews of the MidSouth state court litigation was entered just a few weeks after the Enforcement Opinion, in *Watford v. MidSouth Golf, LLC*, 716 S.E.2d 87 (N.C. App. 2011) (unpublished disposition) (the "Homeowners Opinion").  In the Homeowners Opinion, a different panel of the court considered MidSouth's appeal from various orders entered against it in actions between MidSouth and numerous individual property owners, including actions brought against MidSouth by property owners "seeking relief from the obligation to pay amenity fees." *Id.* at *2.  Specifically, MidSouth appealed two orders in which the trial court "held that the restrictive covenants in the 1975 Supplemental Declaration and the 1979 Master Declaration 'purporting to give [MidSouth], its predecessors and successors the authority to levy against Plaintiff's lots an 'amenity fee' or 'recreation fee' are unenforceable against Plaintiffs." *Id.* The appellate court considered three arguments: 1) whether MidSouth was entitled to collect amenity fees under a theory that the plaintiffs[10] were third party beneficiaries of the 1993 Covenant; 2) whether the 1975 Supplemental Declaration, the 1979 Master Declaration, and the 1993 Declaration of Covenants[11] read *in pari materia* establish mutuality of obligations; and 3) in the

---

[10] By "plaintiffs," the court meant "all property owners."  *Id.* at *1.

[11] The three declarations differ in scope and purpose.  The 1971 and 1975 documents are the "Declaration of Restrictions, Treasure Cove of the Atlantic, Inc." and "Supplemental Declaration of Restrictions, Treasure Lake of North Carolina, Inc."; the latter was entered into between Treasure Lake of N.C. Inc. and all successors in title to any numbered lots in the development.  The 1979 document is the "Master Declaration of Fairfield Harbour" and was entered into between FHI and "prospective purchasers" of properties in Fairfield Harbour.  The 1993 document is the "Declaration of Covenants, Conditions and Restrictions for Harbour Pointe Golf Course, Harbour Country Club and Harbour Recreation Complex" and is a declaration of intent on the part of MidSouth's predecessor, FCI.  Each of these documents contain stipulations that the covenants and stipulations therein are intended to run with the land, and to serve the objective of ensuring amenities benefitting the community as a whole.

alternative, whether, if the court determined that MidSouth could not collect amenity fees from the homeowners, the 1993 Covenant was unenforceable against MidSouth. *Id.* at *2.

As to the first argument, the court concluded that the property owners were not third party beneficiaries under the 1993 Covenants, even though the document recites that it was created "for the benefit of [FCI and its successors and assigns], [FHPOA], and the property owners that are members of [FHPOA]." Explaining that "a person is a direct beneficiary of the contract if the contracting parties intended to confer *a legally enforceable benefit* on that person," the court concluded that the property owners had no such benefit because the property owners had no rights, under the 1993 Covenant, to enforce its provisions. *Id.* at *3 (citation and quotation marks omitted; emphasis in the Homeowners Opinion). Instead, "[p]ursuant to the terms of the 1993 Covenant, only two entities, FCI and its successors and assigns and [Fairfield], have the authority to enforce the 1993 Covenant." *Id.* Fairfield, the court clarified, is "a separate entity from the individual plaintiffs." *Id.* at 4, citing *Beech Mountain Property Owners' Ass'n v. Current*, 240 S.E.2d 503 (N.C. App. 1978) (individual lot owners had rights under covenant to sue to enforce restrictions, but the property owners' association – despite being agent for property owners – could not sue on their behalf; association was not a third party beneficiary with enforcement rights because it was "an entity distinct from its individual members").

In fact, though not addressed in the opinion, the agreement of purchase and sale as between MidSouth and HRC (which includes the 1993 Covenants as a permitted title exception, and thus establishes the avenue by which those covenants apply) provides as follows:

3. Purchase Price and Terms.
The purchase price and terms of payment, subject to all adjustments and credits provided, an the other terms of purchase shall be as follows:
    (a)    Purchase Price.

21

* * *

(b)     Amenity Fees.

The parties agree that by virtue of various protective covenants governing the Property and other land within the area commonly known as Fairfield Harbour, to wit: that certain Supplemental Declaration of Restrictions recorded on November 21, 1975 in the Craven County Registry at Deed Book 858, Page 9 and that certain Master Declaration for Fairfield Harbour, Inc. recorded on December 21, 1979 in the Craven County Registry at Deed Book 951, Page 35, the *Purchaser, as owner of the Property, will be entitled to charge certain land owners an annual fee to offset the cost of the maintenance and repair, and in some instances, the operation, of the Property.* Purchaser hereby agrees that it will limit any increase in said fee from the current rate of $360 per assessed lot to no more than that necessary to cover any increase in said costs; and, in any event, to a maximum of five percent (5%) per annum regardless of any actual increase in relevant costs that would otherwise justify an increase of more than five percent (5%) per annum.

*The owners of land and lots subject to the payment of this fee are expressly intended to be, and hereby are made, Third Party Beneficiaries of this provision and it is expressly agreed by the parties that these Third Party Beneficiaries may take whatever action is necessary at law, or in equity, to enforce their rights under this provision.* Purchaser further agrees that it will make available upon reasonable notice and during office hours in April of each year, its books and financial records pertaining to said costs to a Certified Public Accountant selected and compensated by the Fairfield Harbour Property Owners Association[,] its successors or assigns, and who is acceptable to the Purchaser, in order that this provision of the contract may be effectively enforced.

Fairfield Threshold Mem. Exhibit 1 (Record on Appeal, Enforcement Opinion, at 179 (Agreement of Purchase and Sale, Sec. 3(b) at 3) (emphasis added)).  The purchase agreement is subject to the 1993 Covenants to the same extent that it is subject to the 1975 and 1979 declarations, in that the purchase agreement cites all three of those documents in Exhibit D, Permitted Title Exceptions.  *Id.* The *Homeowners* court did not remark in any way on this provision.[12]

---

[12] Nor did the *Timeshare* court, or the *Enforcement* court.

22

Next, the court considered MidSouth's argument that the 1975, 1979, and 1993 covenants "read *in pari materia* establish a mutuality of obligations which entitles MidSouth to collect amenity fees from Plaintiffs," and specifically that the plaintiffs' right to "walk, jog, or run on the Golf Courses is interdependent with the right of MidSouth . . . to collect an amenity fee." *Id.* at *5. The court stated that it was bound by its conclusion in the Timeshare Opinion that the timeshare owners had no easement rights in the recreational amenities, and instead had only a revocable license; for that reason, the covenant to pay amenity fees did not touch and concern their properties, did not run with the land, and thus was "not enforceable by [MidSouth], as a successor in interest to the original covenantor." *Id.* From this, the court concluded that "MidSouth cannot enforce the covenant to pay amenity fees in the 1979 Master Declaration."[13] Further, that "the language in the 1975 Supplemental Declaration is very similar to the language in the 1979 Master Declaration."[14] And,

---

[13] This broad statement goes beyond the *Timeshare* court's holding, and presumably extends to the owners of all *other* properties in the development, including single family homes and condominiums the same rationale the *Timeshare* court applied to the owners of timeshare properties. This leap of reasoning is problematic: Within the development, there are properties of varying proximity to the amenities, and quite probably shared property lines, which gives rise to a different fact set. The court of appeals' decision does not contemplate whether the nature of other homeowners' property interests might differ in any material way from those of the timeshare owners, much less leave room to address it.

[14] It is not clear which portions of the two documents the court of appeals was comparing. But, both the 1975 Supplemental Declarations and the 1979 Master Declarations recognize property owners' rights to use the amenities. The 1975 covenants provide:

> 13. Declarant [*i.e.* MidSouth as successor to FHI], its agents, successors or assigns shall have the right to publish a list of lots subject to charges hereunder, which charges are in a delinquent status; and Declarant, its successors and assigns, shall have *the right to suspend the use of all recreational amenities owned* by the Declarant, its successor and assigns, by any *person or persons basing the right of use of such recreational amenities upon the ownership or possession of any such lot upon which charges provided for hereunder are delinquent*.

23

that the plaintiffs "are not third party beneficiaries to the 1993 Covenant, so MidSouth cannot collect amenity fees *on that basis*."[15]  *Id.* (emphasis added).  Taken together, the court wrote, the documents "do not provide a basis for MidSouth to collect amenity fees from Plaintiffs."  *Id.*

Finally, the court moved to MidSouth's "last gasp" argument; if it could not collect amenity fees from the individual landowners, MidSouth argued, "there has been a failure of consideration for the burdens imposed on MidSouth by the 1993 Covenant."  *Id.*  The court held that this issue was not properly before it.  "The trial court did not determine whether the 1993 Covenant was enforceable against MidSouth."  *Id.* at *6.  While the court could have stopped there, it went on to opine that precisely that issue "was recently decided by another panel of this Court," in the Enforcement Opinion.  It then offered a brief interpretation of the Enforcement Opinion, which, according to the *Homeowners* court, held that the 1993 Covenants were supported by sufficient consideration to be valid, included a severability clause which authorized continued enforcement of the maintenance covenant even absent the "illegal" amenities provision: "[T]hus, the court rejected MidSouth's argument that because MidSouth was no longer receiving the amount necessary in fees to maintain the golf courses, it was no longer required to operate the golf courses."  *Id.* at *6.  Notwithstanding the *Enforcement* court's statement that there was "nothing here to suggest that

---

1975 Supplemental Declaration at ¶ 13 (emphasis by the court).  The 1979 Master Declaration is virtually identical.  *See* 1979 Master Declaration at 6 (Art. I, Sec. 13).

[15] The 1993 Covenants include the same "license" descriptor used in the 1979 Master Declaration, along with the explanation that "in no event shall Owner, its successors, grantees or assigns prohibit owners of property within the Project reasonable access to the Amenities, which access may be subject to provisions herein provided and such other reasonable rules, regulations and restrictions as the Owner, its successors, grantees or assigns may from time to time promulgate or establish."  1993 Covenants, Sec. 3.10 at 8.  This language could support the interpretation that individual property owners had a right to use the amenities subject to terms and conditions established by the owner, which right could not unreasonably be withheld; the court of appeals, however, construed it differently.

24

[MidSouth]'s right to collect the amenity fees was unenforceable,"[16] the Homeowners Opinion rejected the bases upon which MidSouth sought to compel the homeowners to pay the amenity fees. In very general terms, the upshot of the opinion was that MidSouth was required to maintain the amenities under the 1993 Covenant, yet the homeowners were relieved of the obligation to pay the amenity fees that would fund that endeavor.

## C.    Application of *Rooker-Feldman* Doctrine

Fairfield  accurately recites the underpinnings of the *Rooker-Feldman* doctrine, which is "defined as, '[t]he rule that a federal court cannot consider claims actually decided by a state court or claims inextricably intertwined with an earlier state court judgment.'" *In re Kimmel*, 527 B.R. 215, 219 (Bankr. E.D.N.C. 2015) (internal citation omitted).  A claim is "inextricably intertwined" within the meaning of the doctrine if "granting of the relief sought by the plaintiff in the federal complaint must necessarily determine that the state court judgment was 'erroneously entered or must take action that would render the judgment ineffectual." *In re Hinson*, 481 B.R. 364, 374 (Bankr.

---

[16] Significantly, what the Enforcement Opinion *also* said was this:

Here, there was sufficient consideration to support the validity of the restrictive covenants. Defendant argues that because of the timeshare decision, and subsequent actions by the residents, there was a failure of consideration and that excused it from its obligation to maintain and operate the amenities.  *There is nothing here to suggest that Defendant's right to collect the amenity fees was unenforceable. When Defendant took control of the golf courses, they began to collect fees from the assessed owner for the maintenance of the courses.  Though there is evidence that many of the assessed property owners are no longer paying the amenity fees and are boycotting the golf courses, the initial contractual agreement remains valid.  Accordingly, the trial court appropriately determined that the original contract between the parties does not fail for lack of consideration.*

Enforcement Opinion, 715 S.E.2d at 282 (emphasis added).

25

E.D.N.C. 2012).  With this in mind, Fairview insists that "[c]learly, stripping Midsouth's property of the *perpetual* obligation to maintain its property would render the state court judgment that it had an affirmative obligation to maintain its property and that it had breached the 1993 Covenants ineffectual."  Fairview Threshold Mem. at 14 (emphasis added).  More specifically, Fairview contends that the state courts "found the 1993 Covenants are not personal," that the issue was "actually litigated," and that there "is no question but that the North Carolina State Courts have already determined that the 1993 Covenants[17] or as the Court characterizes it, the "maintenance covenant" is a "real" covenant enforceable by the POA [Fairfield]."  Fairfield Threshold Mem. at 23.

This court has undertaken an exhaustive review of the three court of appeals' decisions, the parties' briefs and all accompanying materials, and the covenants themselves.  There is no state court determination, at any level, that the maintenance covenant is a real covenant.  The state courts undertook standard contract-based analyses in determining whether MidSouth's failure to maintain the recreational amenities as required by the terms of the 1993 Covenants constituted a breach of contract, ultimately concluding that it did, which resulted in a corresponding award of damages.  *See Enforcement Opinion*.  There was no issue with respect to whether the 1993 Covenants applied to MidSouth – they did, and they do.  Fairfield was specifically identified in the 1993 Covenants as having the power to enforce them. The reason that the *Timeshare* court undertook a "real or personal covenant?" analysis, which it did with respect to the *amenities covenant only*, was due to its

---

[17] As noted earlier, referring to the declarations of covenants in a general or collective sense can foster confusion, one example being that the "1993 Covenants" reference and assign to the owner of the amenities the power to levy amenity fees.  Obviously, Fairview would not include this particular covenant among those it believes to be "real."

conclusion that the timeshare owners were not otherwise bound by the 1979 Master Declaration, such that MidSouth could enforce the amenities covenant against them *only* if it was a real covenant.

Nonetheless, Fairfield argues to this court that the "personal covenant" issue was "actually litigated" by reason of MidSouth dubbing its unsuccessful Eighth Defense to Fairfield's complaint a "personal covenant" defense. [18]  Fairfield equates dismissal of that Eighth Defense (along with the state courts' multiple findings to the effect that the 1993 Covenants are enforceable against MidSouth by Fairfield) to a judicial determination that 1) the maintenance covenant is not a personal covenant; which 2) means it's a real covenant given that a covenant has to be either real or personal; which 3) means that the maintenance covenant runs with the land.  These arguments are both facile and flawed.  To agree with them, this court would have to engage in an overbroad reading of MidSouth's defense, blindly agree with Fairfield's speculations as to the precise basis upon which the trial court dismissed that defense, apply sloppy and conclusory reasoning to subtle yet basic questions of state contract law, *and ignore the trial court's express admonition that its dismissal of the defense was not to be relied upon for any other purpose. See* Order, Fairfield Harbour Prop. Owners' Assn. v. MidSouth Golf, LLC, File No. 08-CVS-703 (Craven Co. Sup. Ct. June 27, 2009). The court will do none of these things.

While no state court judgment binds this court's resolution of the legal issues before it within the meaning of the *Rooker-Feldman* doctrine, the North Carolina courts' determinations obviously do inform this court's analysis, and the court acknowledges that its decision with respect to whether the maintenance covenant is a real covenant that runs with the land is not made on a clean slate.  In applying state law, this court is "obliged to apply the jurisprudence of North Carolina's highest

---

[18]  This is in the context of the litigation culminating in the Enforcement Opinion.

court, the Supreme Court of North Carolina." *Laboratory Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 447, 463 (M.D.N.C. 2015), *citing Private Mort. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). "When that court has not spoken directly on an issue, this court must 'predict how that court would rule if presented with the issue,'" with respect to which the "decisions of the North Carolina Court of Appeals are the 'next best indicia' of what North Carolina's law is." *Id.* (citations omitted). However, decisions of an intermediate state appellate court "'may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Id.*, *quoting Private Mortg.*, 296 F.3d at 312 (quoting *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992)).

The task before this court is to resolve the legal issues before it based upon its own findings of fact, while also respecting as settled the state courts' findings of fact and the conclusions of law based upon them. For example, the court of appeals held in the Timeshare Opinion that the 1979 Master Declaration provided to the timeshare owners "merely . . . a revocable license" to use the recreational amenities, but not an easement. On that basis, the court concluded that the covenant to pay an amenity fee for maintenance of the recreational amenities did not touch and concern the land. *Timeshare Opinion*, 652 S.E.2d at 387. This finding has both factual and legal components, which constitute "fixed points" in the state court litigation and in this bankruptcy case. The court accepts these fixed points notwithstanding its disagreement with some aspects of those decisions, and despite the challenges created by the myriad inconsistencies between them.[19] For present

---

[19] For example, the court of appeals recently characterized its *Timeshare* holding as follows: "[I]n regard to the 'touch and concern' requirement, this Court has generally held that 'covenants to pay money do not touch and concern the land' unless assessed homeowners have *a right to use* amenities improved or maintained by the assessed fee." *Properties of So. Wake, LLC v. Fidelity Bank*, 224 N.C. App. 398, 2012 WL 6590844 (N.C. App. 2012) (unpublished

purposes, what matters is that the *Timeshare* court found as a fact that the Fairfield homeowners have only a revocable license to use the amenities, and then found as a matter of law that such revocable license does not touch and concern the land.

## II.    Maintenance covenant is a personal covenant

The burden of showing that the maintenance covenant runs with the land is on Fairfield, which it sought to meet in this matter by insisting that the question was already resolved and not subject to this court's consideration.[20] *Runyon v. Paley*, 416 S.E.2d 177, 185-86 (N.C. 1992) ("'Restrictions in a deed will be regarded as for the personal benefit of the grantor unless a contrary intention appears, and the burden of showing they constitute covenants running with the land is upon the party claiming the benefit of the restriction.'" (quoting *Stegall v. Housing Authority*, 178 S.E.2d 824, 828 (N.C. 1971))).  The "significant distinction" between a personal or real covenant "is that

disposition) (emphasis added).

But, the *Timeshare* court emphasized that the covenant to pay for amenities could not touch and concern the land where the homeowners lacked a specifically denominated *easement* to use the amenities. The distinction matters.  Moreover, as a further twist of irony, the timeshare owners *did* have a *right* under the 1979 Master Declaration to use the amenities improved and maintained by the amenity fees; what they did *not* have was a specifically denominated *easement* to do so.  *See* Timeshare Opinion, 652 S.E.2d at 386-87; *see also* 1979 Master Declaration at Art. 1, Para. 13 at 6.  Similarly, as discussed earlier, the *Neponsit* case, upon which the *Timeshare* court based its "easement-only requirement," actually required easements *or rights of enjoyment*.

There is no consistency here, making it impossible to confidently reconcile the court of appeals' conflicting pronouncements on the difference between and the comparative significance of a property owner having a right, or a license, or an easement to use amenities of the sort at issue here.

[20] Fairfield further maintains that even if the question was properly within the province of the bankruptcy court, it could be resolved only in an adversary proceeding ("AP").  MidSouth, while not enthusiastically agreeing on this point, has indicated that it also believes an AP might be necessary and, if so, that the matter could be addressed in the existing AP, which is currently stayed.  *See* MidSouth Threshold Mem. at 9.  The court sees it differently, and will explain at the conclusion of this order why it is not necessary (indeed, at this point, it would be nonsensical) to resolve the covenant question in the context of an AP.

29

a personal covenant creates a personal obligation or right enforceable at law only between the original covenanting parties, . . . whereas a real covenant creates a servitude upon the land subject to the covenant ("the servient estate") for the benefit of another parcel of land ("the dominant estate")." *Runyon*, 416 S.E.2d at 182; *see also Armstrong v. Ledges Homeowners Ass'n, Inc.*, 633 S.E.2d 78, 85 (N.C. 2006) ("Affirmative covenants impose affirmative duties on landowners, such as an obligation to pay annual or special assessments for the upkeep of common areas and amenities in a common interest community."). "As such," the *Runyon* court went on, "a real covenant may be enforced at law or in equity by the owner of the dominant estate against the owner of the servient estate, whether the owners are the original covenanting parties or successors in interest." *Id.* The maintenance covenant, like the amenities covenant, is affirmative, and "the requirements for a covenant to run are more strictly applied to affirmative covenants than negative covenants." *Raintree*, 248 S.E.2d at 908. This rule of strict construction is "grounded in sound considerations of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to the fullest extent." *Charlotte Pavilion Road Retail Inv., LLC v. North Carolina CVS Pharmacy LLC*, 767 S.E.2d 105, 107 (N.C. App. 2014).

**A.     Requirements for covenant to run with land**

**1.     Intent that covenant run with land**

The first requirement is that the covenant be intended to run with the land. "[W]hen interpreting contracts, a court's primary purpose 'is to give effect to the original intent of the parties,' but 'covenants are strictly construed in favor of the free use of land whenever strict construction does not contradict the plain and obvious purpose of the contracting parties.'"

*Properties of So. Wake, LLC v. Fidelity Bank*, 2012 WL 6590844 (N.C. App. 2012), *quoting Armstrong*, 663 S.E.2d at 85.

Like the 1979 Master Declaration, the 1993 Covenants are prefaced with an expression of intent that the Property be bound by all of the "easements, covenants, conditions and restrictions" set forth therein, *all* of which were intended to "constitute covenants running with the land" and to serve "the purpose of enhancing and protecting the value, attractiveness and desirability of the Property." The Timeshare court had little difficulty determining that the covenants were intended to run with the land, and this court agrees. The requirement that "the intent of the parties . . . can be determined from the instruments of record" is satisfied here. *Raintree*, 248 S.E.2d at 908.

### 2.        Covenant "touches and concerns" the land

The second requirement, that "the covenant must be so closely connected with the real property that it touches and concerns the land," is not. The 1993 Covenants confer no easement rights in the recreational amenities; not to the homeowners, and not to Fairfield.[21] They provide instead that the "use and enjoyment of the Amenities shall be on such terms and conditions as the Owner, its successors, grantees and assigns, shall from time to time *license*," stipulating further that in no event may the owners of property within the Project be prohibited from reasonable access.

---

[21] Fairfield argues that the 1993 Covenants "reserve a perpetual, non-exclusive Pedestrian Easement" unto Fairfield, for the benefit of homeowners who wish to jog, bike or run along the golf courses. This is accurate, but also beside the point. Neither of the two express easements (utility and pedestrian) described in the 1993 Covenants are at issue here; further, in response to this concern, MidSouth has stipulated that the pedestrian easement is and will remain intact.

The pedestrian easement referenced in the 1993 Covenants reserves unto the grantor Fairfield Communities, Inc. (FCI) a perpetual, non-exclusive easement and right of way for the benefit of individuals owning lots, homes, and "other interests in real property" within the community to permit access to the cart paths, fairways and rough areas during times prior to and after any golf play or maintenance undertaken by the owner of the Property. 1993 Covenants, Sec. 2 ¶ 2.2.

1993 Covenants at 8, Sec. 3.10 (emphasis added).  This is substantively equivalent to the virtually identical provision from the 1979 Master Declaration already construed by the *Timeshare* court, wherein that court concluded that because the timeshare owners had a "mere . . . license" to use the recreational amenities, the amenities covenant was not sufficiently connected to their land.  Without a specifically denominated *easement* in use of the recreational facilities, the *Timeshare* court held, "the recreational amenities are not appurtenant to the Defendants' properties, and therefore, the covenant to pay amenities does not touch and concern Defendant's properties."  Timeshare Opinion, 652 S.E.2d at 388.

This court's obligation is to apply North Carolina state law as set forth by the Supreme Court of North Carolina, and here, it does so in the context of facts and questions of law that differ from those presented to and decided by the court of appeals.  On an entirely clean slate, and in all candor, this court likely would construe the maintenance and amenities covenants very differently from the court of appeals.  Strong arguments could be made that *both* the covenant to maintain and operate the recreational facility amenities *and* the covenant to pay the amenity fees were intended as crucial and integrated components of a planned community, and qualify as valid affirmative covenants that run with the land.  Obviously, that road can no longer be taken.

Returning to the facts and questions of law determined by the state courts with respect to other, related issues in the state court litigation, it appears that deviation from the *Timeshare* court's covenant analysis would foster unfairness and inconsistency in the treatment of the parties' interests. For that reason, the court will apply to the maintenance covenant the same analytical framework used by the state court of appeals in construing the amenities covenant.  Accordingly, where the court of appeals found that a revocable license to use the recreational amenities was not connected

32

to homeowners' use *of their land* in sufficient degree for the *amenities* covenant to run with the land, this court concludes that neither is a covenant requiring *maintenance* of those same amenities (and burdening MidSouth's property) sufficiently connected to any benefits derived by the corresponding dominant estate – here, the homeowners' land. The disconnect lies in what the court of appeals found to be the homeowners' lack of the requisite interest in the amenities subject to the covenants. Whether the covenant pertains to homeowners paying fees for their use of the amenities, or to the amenity owner maintaining the amenities for the homeowners' use, the nature of the "disconnect" remains the same.

Fairfield argues that the "North Carolina State Courts expressly rejected Midsouth's [sic] contention that the covenants were personal and found that, as with other real covenants, the 1993 Covenants were enforceable by the POA [the property owners' association, *i.e.*, Fairfield] ... because the 1993 Covenants contain express easements granted to the POA, thereby meeting the "touch and concern" requirement." Fairfield does not identify the easements to which it refers, but the only possible express easement the court can think of is the pedestrian easement, which is a non-exclusive easement and right of way "for the benefit of individuals and entities owning lots, condominium units, timeshare intervals, homes and other interests in real property within the Project," in order to facilitate the ability of those individuals to "walk, jog or run" along various areas of the golf courses at certain times of day. 1993 Covenants, Sec. 2.2 at 4. As noted earlier, this easement remains intact; it simply isn't at issue. Nor is there any indication that the state courts took any interest in its existence, much less relied upon it.

This court's conclusion that the maintenance covenant is not a real covenant is bolstered by the *Timeshare* court's rejection of MidSouth's effort, back in 2007, to characterize the maintenance

covenant as a real covenant. Then, when MidSouth maintained "that *Runyon* provides support for its argument that *a covenant for maintenance of recreational amenities touches and concerns land* within a subdivision if the value of the lots within the subdivision are affected by the maintenance of the recreational amenities," the court responded, "We disagree."  *Id.* at 388 (emphasis added). Similarly, the court of appeals rejected the argument that a covenant having "some economic impact on the parties' ownership rights" would, for that reason, touch and concern the land.  *Id.*  While that theory might be true of a negative covenant, the *Timeshare* court explained, an *affirmative* covenant requires a different analytical perspective and more stringent standards, which ultimately persuaded it to conclude that "the affirmative nature of the covenant in the present case is strong evidence that the covenant did not run with the land."  *Id.*  The *Timeshare* court's forecast of its view on precisely the issue before this court today is dicta, but it is persuasive.  In deference to that court, and to promote consistency and fairness to the parties, this court concludes for the reasons set forth herein that the maintenance covenant does not touch and concern the land, and thus is not a real covenant.

### 3.        Privity of estate

Finally, to satisfy the third requirement for a covenant to run with the land, there must be "privity of estate between the party enforcing the covenant and the party against whom the covenant is being enforced."  *Runyon*, 416 S.E.2d at 183; *see also PCS Phosphate Co. Inc. v. Norfolk Southern Corp.*, 559 F.3d 212, 222 (4th Cir. 2012) (quoting *Runyon*).  The Supreme Court of North Carolina explained in *Runyon* that "where the covenant is sought to be enforced by someone not a party to the covenant or against someone not a party to the covenant, the party seeking to enforce the covenant must show that he has a sufficient legal relationship with the party against whom enforcement is sought to be entitled to enforce the covenant."  *Runyon,* 416 S.E.2d at 184.  Further,

"[o]ne who seeks to enforce a restrictive covenant 'must show that he is the owner of or has an interest in the premises in favor of which the benefit or privilege has been created; otherwise, he has no interest in the covenant and is a mere intruder.'" *Stegall v. Housing Authority*, 178 S.E.2d 824, 828 (N.C. 1971) (internal citation omitted).

The *Timeshare* court did not reach this factor in its discussion of the amenities covenant. Fairfield, however, insists that there "is no question but that the North Carolina State courts have already determined that the 1993 Covenants or as the Court characterizes it, the 'maintenance covenant', is a 'real' covenant enforceable by the POA."  This is incorrect. If any state court had undertaken the analysis required to make that determination with respect to the maintenance covenant, which by necessity would include examination of the bases upon which Fairfield established that it stood in vertical and horizontal privity of estate with MidSouth, Fairfield  would have identified that finding and, one hopes, provided some form of citation to this court.  Fairfield Threshold Mem. at 23.  Fairfield has not done so.[22]

North Carolina "adhere[s] to the rule that a party seeking to enforce a covenant as one running with the land at law must show the presence of both horizontal and vertical privity.  In order to show horizontal privity, it is necessary that a party seeking to enforce the covenant show that there was some 'connection of interest' between the original covenanting parties, such as, here, the conveyance of an estate in land."  *Runyon,* 416 S.E.2d at 184-85.  And, as the *Runyon* court explained, showing vertical privity

---

[22]  In the Homeowners Opinion, the court observed that the homeowners had argued that the 1993 Covenant did "not apply to them because it [was] outside the chains of title for Plaintiffs' lots," which MidSouth had acknowledged in its responses to requests for admissions. 716 S.E.2d at*6 n.3.

requires a showing of succession in interest between the original covenanting parties and the current owners of the dominant and servient estates.... The most obvious implication of this principle [of vertical privity] is that the burden of a real covenant may be enforced against remote parties only when they have succeeded to the covenantor's *estate in the land*.  Such parties stand in privity of estate with the covenantor.  Likewise, the benefit may be enforced *by* remote parties only when they have succeeded to the covenantee's estate.  They are in privity of estate with the covenantee.

*Id*. at 184.

The court's familiarity with the covenants and contracts in this case suggest that Fairfield would have some trouble meeting the privity requirement, but the parties have not briefed the issue, and the court already has found that the "touch and concern" requirement is not satisfied.  Thus, it is neither necessary nor appropriate to make findings with respect to it.  However, if this opinion is appealed and remanded, the court is amenable to considering arguments on the issue and will rule on that question in order to facilitate a more comprehensive, efficient review on appeal.

**B.    MidSouth's failure to maintain amenities constitutes a breach of contract**

Although the maintenance covenant does not run with the land, that particular covenant was found by the North Carolina trial and appellate courts to be an enforceable contractual provision as between MidSouth and Fairfield.  The trial court made, and the appellate court upheld, a determination that Midsouth breached that obligation, which is the basis for the state court award of monetary damages to Fairfield.  Those damages have been asserted by Fairfield as a claim in MidSouth's chapter 11 case.

The court will, in the process of confirming the debtor's chapter 11 plan, determine the extent of damages due from MidSouth to Fairfield for any continuing, post-petition breach of contract.  Fortuitously, the measure of damages for breach of contract and for breach of a real

covenant would be the same.  *PCS Phosphate*, 559 F.3d at 223 fn 4 (citing *Wise v. Harrington Grove Comm. Ass'n, Inc*., 584 S.E.2d 731, 738 (N.C. 2003)).

## III.    Application of Doctrine of Changed Circumstances

The court additionally and separately holds that *even if the maintenance covenant was a real covenant that ran with the land*, the Property still could be sold within the debtor's plan, free of that maintenance covenant, pursuant to the rationale set forth in *In re Daufuskie Island Properties, LLC*, 431 B.R. 626 (2010).  *Daufuskie* is not controlling precedent in this district, but the case involves a complicated factual dynamic similar to the one before this court, and the court is persuaded by Judge Waites' well-reasoned opinion.  In response, Fairfield contends that MidSouth is not entitled to assert the doctrine of changed circumstances, and also that the *Daufuskie* analysis should not be applied here.  For the reasons set out below, the court disagrees.  Also discussed below is the basis upon which the court's assessment of the intent behind the 1993 Covenants differs from those expressed by the *Enforcement* and *Homeowners* courts, which this court believes to be unsupported by and inconsistent with controlling precedent.  Ultimately, the court concludes that application of North Carolina law and the *Daufuskie* court's analysis to the unique facts of this case could permit sale of the property free of the maintenance covenant as a part of MidSouth's confirmed plan.

## A.    State court consideration of doctrine of changed circumstances does not preclude present consideration of doctrine in bankruptcy court

In August of 2011, in the Enforcement Opinion, the court of appeals considered and rejected a changed circumstances argument advanced by MidSouth.  The *Enforcement* court's discussion of that argument, in its entirety, is as follows:

> Defendant [MidSouth] first specifically argues that a radical change in circumstances has destroyed the essential purpose of the covenant, rendering the covenant unenforceable against Defendant.  We disagree.  "The weight of authority is to the

37

effect that, if substantial, radical and fundamental changes have taken place in a development protected by restrictive covenants, courts of equity will not enforce the restriction." *Higgins v. Hough*, 195 N.C. 652, —, 143 S.E. 212, 213 (1928). Our Court has held that restrictive "covenants may ... be terminated when changes within the covenanted area are so radical as practically to destroy the essential objects and purposes of the agreement." *Medearis v. Trustees of Meyers Park Baptist Church*, 148 N.C. App. 1, 6, 558 S.E.2d 199, 203 (2001) (internal quotation marks omitted). There is not a bright-line test for determining whether a radical change has occurred and the inquiry depends on the facts and circumstances presented in each case. *Id.* at 7, 558 S.E.2d at 204.

Typically, cases in which we have contemplated whether a radical change terminated a restrictive covenant involved physical changes in the covenanted area. *See Tull v. Doctors Building, Inc.*, 255 N.C. 23, 38, 120 S.E.2d 817, 827 (1961); *Hawthorne v. Realty Syndicate, Inc.*, 300 N.C. 660, 667-68, 268 S.E.2d 494, 499 (1980); *Sterling Cotton Mills, Inc. v. Vaughan*, 24 N.C. App. 696, 212 S.E.2d 199 (1975); *Barber v. Dixon*, 62 N.C. App. 455, 302 S.E.2d 915 (1983).

In this case, Defendant is unable to identify changes within the covenanted area that were so radical, that they would destroy the original purposes of the agreement. The restrictive covenants require Defendant to maintain and operate the golf course and other amenities in the community. Defendant asserts that because many of the assessed lot owners refuse to pay the required amenity fees, it is unable to comply with the obligations of the restrictive covenants. Defendant fails to cite, nor can we locate, a case in which *a financial hardship* qualified as a "radical change" occurring within a community. Defendant offers no evidence of changes *to the community* that would destroy the purpose of maintaining a golf course in the covenanted community. The community remains a residential neighborhood and covenants *creating golf courses and amenities for the benefits of those residents* are not destroyed.

Enforcement Opinion, 715 S.E.2d at 281-82 (emphasis added). In the view of the *Enforcement* court, the specific question before it was whether MidSouth's "financial hardship" could qualify as a radical change occurring within what the *Enforcement* court deemed the relevant "community." That court concluded that it could not.

Based on this, Fairfield insists that MidSouth is precluded from even *making* a "changed circumstances" argument by virtue of having "already advanced in the North Carolina State Courts the contention that its' in ability [sic] to collect the recreational amenity fee constituted a material

38

change in circumstances, and that argument was rejected, as the change necessary to warrant modification of restrictive covenants is focused upon the property subject to the covenants, not the owner of the property or that owner's circumstances, including litigation."  Fairfield Threshold Mem. at 4.  This court does not agree.  There aren't many doctrines more overtly temporal than the doctrine of changed circumstances, which, *by its nature, requires a change in circumstances*.[23]

Whether subsequent events give rise to a set of facts sufficient to support a legal determination that the doctrine applies, and to support sale of the property free of a real covenant, is a question MidSouth is entitled to put before this court.  Further, there is zero risk that assertion of the doctrine gives "state court loser" MidSouth a "second bite of the apple" of the kind precluded by the *Rooker-Feldman* doctrine.  Indeed, having the benefit of the state court's articulation of precisely the nature and scope of the argument it considered and rejected, this court is entirely capable of adjudicating the issue before it without risk of the sort of legal trespass Fairfield warns against.

**B.**    ***Daufuskie* analysis is not precluded**

Fairfield also maintains that *Daufuskie* reflects unique components of South Carolina law, including a more expansive approach to the doctrine of changed circumstances than the courts of

---

[23] By way of overview, and with an eye toward the generalities of "what happened when" in terms of legal proceedings, the facts and circumstances before the *Enforcement* court were presented in the context of an appeal noticed by MidSouth in August 2009, in consequence of trial court  rulings emanating from the action Fairfield filed against MidSouth in 2008.  That court issued its opinion on August 16, 2011.  Three weeks later, on September 6, 2011, a separate panel of the court of appeals issued the Homeowners Opinion.  And, on December 20, 2013 – almost two and a half years ago – MidSouth filed a chapter 11 petition, bringing its financial predicament within the jurisdiction of this court.  In sum, many years have gone by and a lot has happened subsequent to MidSouth's presentation of its "changed circumstances" argument in 2008 and/or 2009.

this state would apply.  However, there is nothing unique to South Carolina law such that the doctrine *exists* there, but not here.  It is beyond dispute that in North Carolina, restrictive covenants that run with the land "may be terminated in several ways.  Covenants may be terminated when they provide for their own termination." *Medearis*, 558 S.E.2d at 203, *citing Tull*, 120 S.E.2d 817. "Covenants may also be terminated when changes within the covenanted area are 'so radical as to practically destroy the essential objects and purposes of the agreement.'" *Id., quoting Tull*, 120 S.E.2d at 828.  Theories of waiver, estoppel or laches also may negate a party's right to enforce a real covenant.  *Id.* (citing cases); *see also, e.g.*, *PCS Phosphate Co.,* 559 F.3d at 223 (construing North Carolina law in considering defendant's assertion of the doctrine of changed circumstances as a defense to enforcement of a real covenant and concluding that it did "not bar enforcement of the agreements because [defendant] Norfolk Southern voluntarily agreed to the alleged changed circumstances"); *Karner v. Roy White Flowers, Inc.*, 527 S.E.2d 40, 43 (N.C. 2000) (noting that "whether a change of circumstances has taken place so as to void a restrictive covenant in equity depends on the facts of each specific case").  The appropriate focus is not on whether MidSouth can assert the doctrine at all – it can – but on whether MidSouth can establish, under North Carolina law, that the doctrine applies and warrants termination of the maintenance covenant.

**C.    Determinations of "intent" in Enforcement and Homeowners Opinions**

The *Enforcement* court considered the question of intent in the context of MidSouth's "reciprocal benefits" argument, and reached the following conclusion:

> In its brief Defendant [MidSouth] asserts that the restrictive covenants imposes [sic] reciprocal benefits and burdens upon Plaintiff [Fairfield] and Defendant.  Because Defendant was no longer receiving the amount necessary in fees to maintain the golf course, it was no longer required to operate the golf courses. However, language in the restrictive covenants specifically provides that the restrictions contained within the covenant are severable.  Merely because one restriction in the covenant was

declared illegal, the enforceability of the other provisions is not affected. *Because language in the 1993 restrictive covenants clearly indicates that the restrictive covenants were not intended to afford reciprocal benefits upon [sic] the parties*, Defendant's argument is without merit.

Enforcement Opinion, 715 S.E.2d at 282-83; *see also* Homeowners Opinion, 716 S.E.2d 87 at *6 (quoting same). In other words, the *Enforcement* court concluded that inclusion in the 1993 Covenants of a run-of-the-mill severability clause provided a basis upon which to construe "the parties'" intent as to the specific provisions therein – and not only that, but to actually *negate* the expressed intent of the 1993 Covenants. On that same basis, the court rejected MidSouth's frustration of purpose argument, concluding that "the parties" had "contracted in reference to the allocation of the risk involved in the frustrating event." Enforcement Opinion, 715 S.E.2d at 284. In fact, the 1993 Covenants were not executed by "parties" but by Fairfield Communities, Inc., which was then the owner of the Property, in order to establish a sustainable framework for the development of the Fairfield Harbour community.

Based on the same reasoning, the *Homeowners* court rejected MidSouth's failure of consideration argument, which was that if Midsouth "cannot collect amenity fees from [homeowners], there has been a failure of consideration for the burdens imposed on MidSouth by the 1993 Covenant." Homeowners Opinion, 716 S.E.2d at *5. The court's rejection had two steps: First, it said the question was not properly before it as the trial court had not determined whether the 1993 Covenants were enforceable against MidSouth. Next, it stated that the question of enforceability was "recently decided" by a separate panel, and then quoted the *Enforcement* court's conclusion, above – again citing the severability provision. *Id.* at *6. In sum, MidSouth's lack of reciprocity, frustration of purpose, and failure of consideration arguments were summarily rejected on grounds that a severability clause is included in the 1993 Covenants.

41

However, if the language in the 1993 Covenants "clearly indicates that the covenants were not intended to afford reciprocal benefits to the parties," then, they *would not even be covenants*. The North Carolina Supreme Court has explained that "[t]he word covenant means a binding agreement or compact benefitting both covenanting parties." *Armstrong v. Ledges Homeowners Ass'n*, 633 S.E.2d 78, 84 (N.C. 2006), *quoted in Wein II, LLC v. Porter*, 683 S.E.2d 707, 712 (N.C. App. 2009). Further, "[a] covenant represents a meeting of the minds and results in a relationship that is not subject to overreaching by one party or sweeping subsequent changes." *Armstrong*, 633 S.E.2d at 84-85. Here, it is apparent to this court that the 1993 Covenant, like the 1979 Master Declaration construed in the *Timeshare* opinion, sought to perpetuate many obligations and understandings for the entire Fairfield community. Paramount among those were the obligation of the Property owner to maintain certain amenities *and* the Property owner's right to assess recreational amenity fees *for maintenance purposes*. E.g., 1993 Covenants, Sec. 3 ¶ 3.7 ("Company hereby assigns the power to levy Amenity Fees to Owner *for the reasonable and proper operation, maintenance, repair and upkeep of the Amenities ....*") (emphasis added). Both the court of appeals (in the *Timeshare* opinion, construing the 1979 Master Declaration) and this court (as to the 1993 Covenants) specifically found that those documents *intended*, in a comprehensive sense, that the obligations set forth in them would constitute covenants that ran with the land. Again, MidSouth was not a party to any of the declarations or covenants: Rather, its ownership of the Property is subject to the terms of those declarations and covenants to the extent those terms were incorporated as a component of its purchase of the Property.[24]

---

[24] MidSouth's "Agreement and Purchase of Sale" incorporates the 1993 Covenants by virtue of including this entry among the permitted title exceptions: "Restrictive covenants, conditions and easements recorded in Book 1386, Page 1, Craven County Registry."

A review of opinions issued by the North Carolina Supreme Court compels this court to the conclusion that on this point, the Enforcement and Homeowners Opinions are not representative of North Carolina state law, and that the state supreme court would reach a different conclusion with respect to whether inclusion of a boilerplate severability clause in a declaration of covenants establishes that the covenants were "not intended to afford reciprocal benefits." *See Private Mortg.*, 296 F.3d at 312 (federal court may disregard decisions of an intermediate state appellate court if "convinced by other persuasive data that the highest court of the state would decide otherwise"); *Laboratory Corp. of Am. Holdings*, 84 F. Supp. at 463 (same). The court includes this explanation now for several reasons; first, to identify what it considers to be a clear error of law, in the interest of transparency and not perpetuating it any further; second, to acknowledge that this court has no authority to revisit, endeavor to correct, or otherwise act upon these determinations by the state court; and, third, to explain why the court must follow different precedent in any determinations as to which the "intent" of the 1993 Covenants is a material factor.

**D.    *Daufuskie analysis***

In *Daufuskie*, the bankruptcy court for the District of South Carolina found that the chapter 11 trustee could sell property subject to a real covenant that ran with the land free and clear of that covenant pursuant to either the doctrine of changed circumstances, or by reason of a bona fide dispute regarding the covenant's validity.[25]   The *Daufuskie* court accepted as a starting point that

---

[25] That latter factor was at issue because the trustee pursued a sale outside the ordinary course of business under 11 U.S.C. § 363(b) and prior to confirmation of the debtor's plan, such that the sale was subject to the requirements of § 363(f). Here, in contrast, the debtor seeks to sell the property *within* its chapter 11 plan, which requires a determination that the sale is "fair and equitable" and extends to Fairfield and all interested parties the full, traditional range of bankruptcy protections.

a reconveyance right, held by creditor MCI and asserted as an obstacle to the trustee's proposed sale of the debtor's resort properties to third party Montauk, was a real covenant running with the land. *Daufuskie*, 431 B.R. at 635. The trustee proposed to accept the highest and best offer for sale of the property, conveying the land to Montauk free and clear of MCI's right and interest. *Id.* at 636. This, the trustee testified, was consistent with what he understood the purpose of the reconveyance right (and the Agreement of which it was a component) to be: To protect MCI and surrounding property owners from deterioration of the facilities and property, and to maintain the property's high level of quality. *Id.* Without a prompt sale, the trustee anticipated a forced shutdown of operations and attendant deterioration of the property's value. *Id.* Thus, the trustee sought to sell the property free and clear of liens, claims, encumbrances and interests[26] by establishing that "at least one of the provisions of § 363(f)(1)-(5) is applicable to each lien or interest from which the Sale is to be free and clear." *Id.* at 637.

In that context, the bankruptcy court focused first on whether a real covenant is the sort of "interest in property" that is subject to discharge under either § 363 subsection (f)(1) (sale permitted under applicable non-bankruptcy law) and/or § 363 (f)(4) (bona fide dispute). It is "well settled that what constitutes an interest under § 363(f) is defined by state property law." *Id., citing In re FCX,*

---

[26] In assessing the status and nature of MCI's interest, the bankruptcy court noted that the "Transfer Agreement at issue in this litigation is a complicated document that has served a purpose between the parties over a number of years; however, the document is not wholly consistent." *Id.* at 641. In particular, the reconveyance right, which by its written terms ran with the land, appeared to be significantly different from other provisions pertaining to the rights of MCI's members to use the club and facilities on the land, and to maintain club memberships; these, the court held, appeared to be "transferable and not tied to real property under the terms of the agreement." Given that any rights of MCI and its members to use facilities and amenities on the property did not run with the land, while MCI's asserted right to repurchase the property (which, as the court later explained, was intended to facilitate that usage) did, there are interesting parallels between that case and this one.

*Inc.*, 853 F.2d 1149, 1153 (4th Cir. 1988) ("The existence and nature of a debtor's, and hence the estate's, interest in property must determined with resort to nonbankruptcy law," either state or federal.), *cert. denied, Universal Cooperatives v. FCX, Inc.*, 489 U.S. 1011 (1989). Here, where MCI's claimed interest in the debtor's property was a reconveyance right set out in a real covenant, it was subject to being dispelled under § 363(f).

Turning to § 363(f)(1), the court noted that "South Carolina case law indicates a very strict application of the changed circumstances doctrine" and required a showing of such a significant change with regard to the servient property "so as to render a covenant valueless to the covenantee and oppressive and unreasonable as to the covenantor." *Id.* at 644. The court found that the reconveyance covenant was oppressive and unreasonable, and declared it a nullity. Id at 644-45. The court based its decision on a multitude of factors, including its findings that the covenant no longer provided any real protection to MCI and its members (given that club memberships would be extinguished by the sale); the prospective property buyer's indication that it would not complete the purchase with the provision in place; inhibitions on the debtor's ability to obtain loans; the expected closure of "all operations on the property, which would defeat the objectives of the [provision] and expose the Estate, the creditors, MCI, and surrounding property owners to potentially disastrous consequences"; and, finally, public policy, which made enforcement of the covenant unfair.

Alternatively, Judge Waites wrote, "these issues raise a bona fide dispute, creating substantial issues on an objective basis for both factual and legal dispute as to the validity of the asserted MCI interest. Pursuant to 11 U.S.C. § 363(f)(4), the Court may authorize the Trustee to sell property under § 363(b) free and clear of any interest in such property of an entity other than the

estate only if such interest is in bona fide dispute." *Id.* at 645. Allowing such sale serves the goal of § 363(f)(4), which is to "allow the sale of property subject to dispute so that liquidation of the estate's assets need not be delayed while such disputes are being litigated." *Id.* (internal quotations and citation omitted). "Importantly," the court went on, "this standard does not require that the Court resolve the underlying dispute or that it determine the probable outcome of the dispute; rather, it only requires a determination that such a dispute does, in fact, exist." *Id.* (citation omitted).

Applying those standards to the particular facts before it, the *Daufuskie* court held that the trustee had satisfied his evidentiary burden. "Certainly if there are grounds by which the restrictive covenant cannot be enforced by MCI, the covenant is subject to bona fide dispute," the court wrote. Emphasizing the "history of very significant litigation indicating that there have been and still are significant issues in dispute between the parties pertaining to the validity of MCI's interest," including the effect going forward of a provision in the agreement between MCI and the debtor that gave MCI's members the right to use the club and facilities on the debtor's property.[27] The court then authorized and approved sale of the property by the trustee to Montauk, "free and clear of all interests of any kind or nature whatsoever." *Id.* at 647.

E.    **Showing of radically changed circumstances under North Carolina law**

Whether MidSouth can demonstrate that the doctrine of changed circumstances supports sale of its property free of the maintenance covenant (assuming for purposes of argument that it was a real covenant) depends on whether facts unique to this case establish that substantial, radical, and

---

[27] Section 363(f)(4) was specifically alleged in *Daufuskie* as a basis upon which to authorize the trustee's sale of the debtor's property. Application of that section is not presently at issue in this case, so the court has no basis upon which to formally consider whether the facts and circumstances of the instant matter would satisfy the statute, but the court's general impression is that they probably would.

fundamental changes have occurred in the covenanted area.  As the state supreme court explained in *Tull*: "No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement."  *Tull*, 120 S.E. at 828 (internal quotation and citation omitted); *see also In re Daufuskie Island Properties, LLC  ("Daufuskie II)*, 431 B.R. 657, 671-75 (Bankr. D.S.C. 2010) (related, subsequent opinion to *Daufuskie*,  June 30, 2010).

In its Threshold Memorandum, MidSouth outlined the changes as follows:

Since the last COA opinion in September 2011, MidSouth filed its petition for relief under chapter 11 of the Bankruptcy Code and has been operating as a debtor in possession.  The situation before this Court is dramatically different than the facts before the COA when it issued its Enforcement Opinion.  The individual owners of MidSouth have invested approximately $2.5 million to maintain the property on a substantially reduced bases since the last COA opinion was issued, but MidSouth itself has no further resources and the owners are not obligated to continue infusing their personal funds into the Property.  The Property is unmarketable as long as the obligation to maintain the amenities with no corresponding right to collect the amenities fees remains enforceable. [Fairfield] cannot take title to the Property with the Wells Fargo lien in place (and is in no position to purchase the Property in any event), and Wells Fargo will not foreclose with the covenant in place.  A trustee would face identical challenges.  Many of the amenities are not operational, and the original purpose of the affirmative covenant is not being met.  Accordingly, this Court is not addressing the same facts considered by the COA in the Enforcement Opinion, and thus whether there is now a radical change in circumstances affording MidSouth relief from the maintenance covenant is not a question already determined by the COA and subject to *Rooker-Feldman*.

MidSouth Threshold Mem. at 6.  These representations do not constitute evidence, but rather are a forecast of the facts MidSouth believes it could establish in the context of showing, during confirmation, that its Chapter 11 plan is fair and equitable.

Typically, restrictive covenants pertain to physical limitations on what can or cannot be done with land, so whether there have been radical *physical* changes within the covenanted area typically

is the essence of the inquiry.  For example, whether a sufficient percentage of lots within a covenanted area have transitioned from residential to business and professional use to qualify as a radical change is relevant, *if* the covenant at issue pertains to physical restrictions of that nature. Cases of this nature, and *only* cases of this nature, were cited by the *Enforcement* court.  *See, e.g., Tull,* 120 S.E.2d at 827 (physical restrictions: property to be used for residential purposes only, not commercial or parking); *Hawthorne*, 268 S.E.2d at 499 (in case involving residential use restriction, issue was whether changes were so radical as to practically destroy "the residential character of the neighborhood"); *Sterling Cotton Mills*, 212 S.E.2d at 204 (insufficient encroachment to constitute radical or fundamental change where small percentage of lots evidenced business use in land subject to covenant requiring residential use only); *Barber*, 302 S.E.2d at 918 (mobile home precluded by covenant prohibiting temporary structures).

But, relying exclusively on cases that pertain to the typical factual scenario for real covenants – restrictions on physical changes or permitted uses within the covenanted area – would disregard both the nature of the affirmative covenant at issue here *and* the context in which it has effect. The maintenance covenant requires the landowner to engage in certain actions, not to refrain from taking them.  The Fourth Circuit considered a similar situation when it assessed, under Virginia state law, the continuing viability of a restrictive real covenant requiring that the Double Diamond gas station purchase its fuel only from BP Products.  The court took note of several physical factors pertaining to the covenant (e.g., a required two mile radius between gas stations), but its focus in assessing whether changed circumstances should negate the covenant was on the "essential purpose" of the covenant, which was "to ensure an ultimate retail market for BP fuel."   *Double Diamond Properties, LLC v. BP Products North America, Inc.*, 277 Fed. Appx. 312, 318 (4th Cir. 2008)

(unpublished disposition). "In order to determine the extent of the restriction imposed by a covenant," the Fourth Circuit explained, "a court should 'look to the substance-not the label-of the activity sought to be restricted.'" *Id., quoting Providence Square Assocs., LLC v. G.D.F., Inc.*, 211 F.3d 846, 851 (4th Cir. 2000). The *Double Diamond* court enforced the covenant, concluding that its "ultimate objective" was still being met.

Here, even if the maintenance covenant was a real covenant that ran with the land, the doctrine of changed circumstances would permit its removal if MidSouth can demonstrate, in the context of confirmation, the occurrence of radical and fundamental changes of circumstances sufficient to warrant its termination. As should now be clear, the court believes it likely that MidSouth will be able to do so on a variety of fronts.

In addressing these threshold issues, it became apparent to the court that the state court litigation, which culminated in the opinions issued by the court of appeals, has altered the structure and operation of the covenants and ultimately created a contractual landscape vastly different from that envisioned (and imposed) by the original declarants. The covenants (here, the court means the 1975, 1979, and 1993 covenants – any or all of them) convey a crystal clear intent to establish a sustainable, mutually beneficial arrangement by which the community's homeowners pay a fee towards the amenities and therefore get to use them, while the Property owner provides these amenities and therefore is paid a fee. That makes sense. Removing half of that bargain, and requiring the Property owner to continue to provide the amenities, for free (especially based on a severability clause), does not. That said, the state court decisions are final.

This bankruptcy case, however, is underway. Debtor MidSouth owns the Property, and that property is an asset of the estate. The state court litigation and the repercussions from it have

imposed a unique burden on the land, which is not marketable if encumbered by the maintenance covenant. *Something* must be done with the Property,[28] and with the threshold issue of the maintenance covenant's status being resolved, the case will proceed to confirmation.

## IV.    Adversary proceeding is not required

Finally, while Fairfield (and perhaps also MidSouth) believe that any determination as to whether the maintenance covenant is or is not a real covenant must be made in the context of an adversary proceeding, the court finds that it does not. Fairfield insists that Rule 7001 requires an adversary proceeding in this instance, to determine the "validity, priority, or extent of a lien or *other interest in property*," which Fairfield contends that it has. See Fed. R. Bankr. P. 7001(2). But, that argument begs the question – on what basis would it assert such an interest, given that the court has found that the maintenance covenant is not a real covenant? Fairfield cites cases discussing the appropriate forums in which to flesh out the "taking" of various property rights, but where Fairfield cannot assert the requisite interest in property, these cases do not even come into play.

In any event, practically speaking, Fairfield currently is receiving the substance of what it says it wants. Virtually all of the discovery, notice, and other due process protections afforded through such a proceeding have been (and will continue to be provided) in the context of this bankruptcy case. Given the parties' contested approach to this matter, virtually every aspect of this case has aligned with the protocols and procedures associated with an adversary proceeding. If

---

[28] Fairfield would like for MidSouth to remain obligated to provide and maintain the amenities for use by the homeowners for free through 2023, which is when the first thirty-year term under the 1993 Covenants expires. Or, it presumably would not object to sale of the property subject to the maintenance covenant, so long the current "free amenities" situation carries forward. These avenues are untenable for reasons that should be obvious, and Fairview's refusal to consider that does a disservice to the community it serves.

either party believes that an adversary proceeding would provide to them some additional material benefit to which they are entitled, they may bring their concerns to the court's attention.

## CONCLUSION

For the foregoing reasons, the court determines that the maintenance covenant is not a real covenant and does not run with the land. Alternatively, the court finds that even if the maintenance covenant was a real covenant, debtor MidSouth may seek to establish during confirmation that the doctrine of changed circumstances applies. The court's familiarity with this matter leads it to expect that MidSouth probably will be successful in that effort, in which event the court will permit MidSouth to sell the Property[29] free of the maintenance covenant within its confirmed chapter 11 plan. Also to be determined in confirmation is the amount of Fairfield's claim.

## END OF DOCUMENT

---

[29] The continuing viability of other covenants (which range in scope from, for example, the use of the Property for amenities to "Assessed User" tee times) has not been the subject of the parties' dispute, but would be viewed under the same analysis employed by the court in any determination of whether the Property may be sold free and clear of them.